Filed 12/23/13  P. v. Hall CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NATHANIEL VERNON HALL,<br><br>    Defendant and Appellant. | H038706<br>(Santa Clara County<br>Super. Ct. No. C1082794) |

A jury found Nathaniel Hall (appellant) guilty of one count of aggravated mayhem (Pen. Code, § 205, count one), one count of corporal injury on a cohabitant (§ 273.5, subd. (a), count two),[1] resisting or deterring a police officer by threats or violence (§ 69, count three) and three counts of violating a protective order (§ 273.6, counts four through six).  As to counts one and two, the jury found true the allegation that appellant personally inflicted great bodily injury on the victim (§ 12022.7, subd. (e)).

On August 10, 2012, the court sentenced appellant to seven years-to-life on count one.  The sentence on count two—inflicting corporal injury on a cohabitant—was stayed pursuant to section 654.  Further, the court struck the great bodily injury enhancement pursuant to section 1385 and imposed county jail sentences for counts three through six.  As to count three, the court granted appellant probation and imposed a 90-day concurrent

---

[1]    All unspecified section references are to the Penal Code.

county jail sentence, credit for time served—probation to terminate "on his release." The court ordered that the sentences on counts four through six be served concurrently with each other and with appellant's prison term.

Appellant filed a timely notice of appeal. On appeal, appellant challenges the sufficiency of the evidence to support his conviction for aggravated mayhem on the ground that the evidence did not support a finding of specific intent to disfigure the victim; appellant alleges that the trial court erred by refusing to instruct the jury with pinpoint instructions that defense counsel requested; and finally, the court's refusal to give the special instructions requested by defense counsel violated his constitutional due process right to present a defense. For reasons that follow, we affirm the judgment.

*Facts and Proceedings Below*

Ashley Flores had been appellant's girlfriend for three years and had lived with appellant for approximately six months when the incident underlying this case occurred. On August 6, 2010, Flores and appellant consumed a lot of alcohol at a couple of bars, so much so that Flores was intoxicated. She argued with appellant because appellant had suggested that she was flirting with another man.

When Flores and appellant returned home, the fighting continued. Flores left the residence and went to her car because she was tired of arguing. She moved her car to a parking spot on the street as she planned to sleep in the car. Repeatedly, appellant called her on her cellular telephone; she did not answer.

When she awoke, Flores went back to the residence. She noticed that appellant had thrown her television to the floor and had spat on it; appellant was packing his backpack. They argued again. Flores went to pour a cocktail, but appellant knocked it out of her hand. Flores went to the bathroom to take a shower and then returned to the bedroom. She yelled at appellant. Flores testified that she grabbed appellant's neck and

2

pushed him on the bed.[2]  Appellant grabbed Flores's head in both hands and bit off her left eyelid; there was a lot of blood.  Flores ran to the bathroom to see what had happened to her eyelid.  Appellant followed her and then spat out the severed eyelid at Flores.[3]

Flores tried to leave the apartment, but appellant prevented her from going. Appellant threw her to the ground and kicked her; he pulled her hair.  Eventually, Flores ran to the car.  Appellant pushed her into the passenger seat and he got into the driver's seat and drove away.  Flores was wearing only a top when she fled the residence; she wanted to get to the hospital and did not think about putting on her pants.  Appellant drove erratically; Flores was frightened because appellant was enraged.  Later, she told the police that appellant threatened to kill them both.

When appellant stopped the car at a stop sign Flores grabbed the keys and threw them out of the window.  She tried to get out of the car, but appellant grabbed her and held her head against his chest.  Almost immediately, officers arrived on the scene; they pulled appellant from the car.  According to Flores, appellant would not get out of the car when the officer ordered him so to do.  Officers summoned an ambulance to take Flores to the hospital.  She told the officers that appellant was out of control.

Paramedics transported Flores to Valley Medical Center.  She told the nursing staff that her boyfriend assaulted her.  That evening she had surgery to repair the traumatic eye injury she had sustained.  Her head and stomach hurt after the incident. Flores had bruising on her left forearm from the attack as well as a bruise above her right elbow.

---

[2]    However, she admitted that later she told the police that appellant was the first to use physical force, did not tell them that she choked appellant and acknowledged that she told the police the truth when they questioned her later that night.

[3]    Then San Jose Police Officer Joe Kalsbeek photographed the crime scene.  A flat screened television was overturned and there was blood on the carpet near the couch and on the couch, but the bed was made and there was no blood on it.  The bathroom floor had blood drops on it.

Ophthalmologist James Egbert treated Flores's eye injury on August 7, 2010. Flores had two lacerations to her upper eyelid. He performed surgery to repair the eyelid and the tear drainage system. He testified that without the surgery it was likely that Flores would have lost vision in her left eye. Dr. Egbert discovered an old facture to Flores's left orbital area.

As a result of appellant's attack, a restraining order was issued to protect Flores. Nevertheless, appellant telephoned her on August 10, 2010. Flores told appellant she thought he was going to kill her on the night he bit her. Appellant accused her of attacking him, but she denied that she had so done. Appellant telephoned her again on September 2, 2010. In this conversation, again, appellant suggested that Flores choked him; again she denied the allegation. Appellant telephoned Flores again on September 20, 2010. Flores received between 10 and 20 letters from appellant.

Flores admitted that there had been prior incidents of domestic violence. On September 9, 2009, appellant punched Flores twice in the left eye. On another occasion, as Flores was recovering from broken blood vessels in her eye, appellant pushed his thumb into her eye. In May 2010, appellant bit her stomach and breast.

According to Flores, she told a detective that interviewed her that in early 2010, appellant told her he wanted to "hear the sound of flesh" and taste blood.[4] Flores maintained contact with appellant in the months preceding the trial. She admitted that in conversations she had with appellant, appellant referred to himself as a "psychopathic killer" who liked to eat people.

San Jose Police Detective Duane Tuell spoke with Flores on August 10, 2010, two days after the attack in order to obtain a statement. Detective Tuell along with Detective Gonzalez interviewed Flores at her parents' residence. They recorded their conversation

---

[4] At trial Flores tried to downplay the significance of what she told the detective saying she and appellant were discussing a movie. However, she conceded that she did not tell the detective that piece of information.

with her.  Flores never said that she used any physical violence against appellant; rather, it was appellant that initiated the violence.  Flores said that appellant pushed her into the passenger seat of her car.  Flores complained of pain to her stomach and head.  Detective Tuell could see bruising on Flores's arms.

Detective Tuell spoke with Flores by telephone on August 25, 2010.  Flores confirmed that she did not choke or put her hands on appellant.  Flores told him that appellant had expressed the desire to bite flesh.  Flores confirmed to him that she remembered the details of the incident.  On October 26, 2010, Flores telephoned Detective Tuell and said that she might have choked appellant, but she was not trying to hurt him.

Joseph Torres testified that on August 7, 2010, at approximately 2:30 a.m. he was awakened by a woman's screams from the street.  The woman was yelling for help.  It appeared that she was in distress and crying.  He heard the woman say, " 'I didn't do anything.' "  Torres called 911.

Dirk Himley testified that he was sleeping in his San Jose apartment on August 7, 2010.  At approximately 2:30 a.m., he was awakened by red and white lights illuminating his bedroom.  Himley said he looked out the window and saw a white car in the middle of the street.  A police car was in the intersection.  An African American male was at the curb and a police officer was about five feet away.  The African American male resembled someone he had seen in the neighborhood.  The man seemed out of control; he was screaming and flailing his arms.  A woman who was inside a car was trying to calm the man.  The police officer waited for the man to stop yelling and then handcuffed him.  Himley said that he did not see the man push or try to punch the officers.[5]

---

[5]     Officer Kalsbeek interviewed Himley shortly after the incident.  Himley told him that he heard appellant "yelling" and then saw him "fighting with two police officers."  Himley told Officer Kalsbeek that appellant said, " 'Fuck you.  I'm going to fucking kill you' " as he was fighting with the officers.

San Jose Police Officer Michael Kodres was on patrol when he responded to a call at 2970 Magliocco Drive. When he did not see any disturbance he drove around the area. He saw a white vehicle parked at an awkward angle. Officer Kodres parked his patrol car and approached the white car. Flores was in the passenger seat and appellant was on top of her. Flores was crying and appellant was cursing and pushing his face into her face. Officer Kodres ordered appellant to get off Flores. Appellant moved to the driver's side of the vehicle and opened the door. Officer Kodres saw that Flores's face was covered in blood. Appellant said, "I did this. Arrest me." Officer Kodres placed appellant in handcuffs. However, as he tried to escort appellant to his patrol car, appellant pulled away. Despite Officer Kodres telling appellant to stop, appellant continued to pull away from him. Officer Kodres pinned appellant against the car, but appellant continued to struggle. Appellant tried to head butt Officer Kodres, but the officer was able to move out of the way. Officer Cleaver arrived at the scene and helped to subdue appellant. Officer Kodres suffered an abrasion to his knee. Appellant cursed and screamed inside the police car and kicked the Plexiglas barrier between the front and rear seats. Appellant threatened Officer Kodres and made racial slurs and used racial epithets.

Officer Kodres placed a digital recorder in the back of his patrol car. Appellant continued his angry outburst about the officers. At one point appellant stated "Next time I'll shoot her goddamn eyeball out of her face."[6]

Officer Cleaver testified that when he arrived at the scene he saw appellant lying flat on his stomach with his hands cuffed behind his back. Officer Kodres was kneeling, trying to hold down appellant, who was struggling. Officer Cleaver ran over to assist

---

[6] Initially, the court ruled that the recording of appellant's entire outburst was not to be played for the jury as the court determined that his statements were not voluntary. Later, the court ruled that parts of the recording could come in. Thereafter, defense counsel made a tactical decision to allow the whole recording to be played for the jury. Accordingly, Officer Kodres authenticated the tape recording and the entire recording was played for the jury.

Officer Kodres and they asked appellant to calm down. Appellant continued to yell about "racist cops." Appellant moved toward the patrol car, but struggled when the officers tried to put him in the backseat. Appellant hit his head on the patrol car four to six times. The officers had to use force to push appellant's feet into the car. Appellant continued to shout in the back of the patrol car; he used many derogatory slurs.

Officer Cleaver went to talk to Flores. He saw that her face was covered in blood. She was crying and said, repeatedly, "Don't let me lose my eye." According to Officer Cleaver, Flores told him that appellant threw her big screen television onto the ground; that the first physical contact between her and appellant occurred when appellant grabbed her head with both hands and bit her; and that appellant kicked her in the head and stomach. Flores never told him that she choked appellant. Flores said that after she ran from the residence, appellant followed her to her car, pushed her from the driver's seat into the passenger seat and drove away. Flores told him that there were prior unreported incidents of domestic violence.

Kenneth Mark, a forensic toxicologist, testified for the defense on the effects and symptoms of alcohol. He explained to the jury that an individual with a blood alcohol level of .10 would exhibit symptoms of impairment. An individual with a .20 blood alcohol level would be impaired as to their motor skills.

Niven Hall, appellant's brother, testified that he had never seen his brother get physical during an argument, but he had seen Flores throw a bottle when she was angry. He believed that the charges against his brother were inconsistent with his brother's personality.

Appellant testified on his own behalf that on a prior occasion he had struck Flores after he had consumed 10 drinks. He said that Flores had been physically aggressive toward him in the past; he described it as play wrestling. On August 7, 2010, he had consumed approximately 10 drinks. When he and Flores drove home that night, Flores accused him of flirting. Later, when Flores came into the apartment, he left. About 30

7

minutes later, he tried telephoning Flores, but she did not answer. Appellant said he knocked over the television because he was angry; and he did spit on the television. He was packing his clothes when Flores ran over to him and jumped on him, he ended up on the bed. Flores was strangling him and telling him she hated him. He did not want to hit Flores so he bit her on her eyelid. Flores ran into the bathroom, but he did not follow her. Then she ran out of the house.

Appellant said he followed her to the car to see the seriousness of her injury. He said he saw the bleeding and told her to move over so he could take her to Valley Medical Center. Appellant said that they were both crying. He made a comment, "I feel like killing us. This is ridiculous." That was when Flores threw the keys out of the window. Shortly thereafter, officers arrived.

Appellant denied that he attempted to get away from Officer Kodres; and it was the officer that slammed his head into the patrol car and kicked him. Appellant said that he did not struggle getting into the car, but he did curse at the officers. Appellant said that the three officers who testified lied about what happened.

Appellant said that he had a vague recollection of biting Flores's eyelid, but denied spitting the eyelid at Flores. He denied discussing an interest in tasting blood or flesh. He acknowledged that he had violated the no contact order by contacting Flores; and admitted that when he was in the back of the patrol car he said, " 'I'll never have to see that bitch again. Next time, I'll shoot her Goddamn eye out of her face.' " Appellant agreed that in the entire time he was in the back of the patrol car he never said that he was acting in self defense when he bit Flores.

Appellant admitted that he had fractured Flores's eye socket on a prior occasion. He acknowledged that when he telephoned Flores he asked her to show him mercy at least four or five times.

8

*Discussion*

*Sufficiency of the Evidence of Aggravated Mayhem*

Appellant contends that the evidence was insufficient to support the aggravated mayhem conviction. Specifically, he argues that there was insufficient evidence to support the finding that he had the specific intent to disfigure Flores.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27; Accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319-320.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1988) 18 Cal.4th 297, 331.)

"Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

It is well established that "[t]he standard of appellate review is the same in cases in which the People rely primarily on circumstantial evidence. [Citation.] Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt

9

beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]"  (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.)

Section 205 provides, "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body.  For purposes of this section, it is not necessary to prove an intent to kill."

Aggravated mayhem requires proof the defendant specifically intended to maim, that is to cause a permanent disability or disfigurement.  (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1162.)

" 'A jury may infer a defendant's specific intent from the circumstances attending the act, the manner in which it is done, and the means used, among other factors.' [Citation.]"  (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 831.)

Here the evidence showed that appellant grabbed Flores's head and bit her eyelid so hard that part of it was severed from her face.  When she ran to the bathroom, he followed her and spat the severed part at her.  Had appellant not intended that the disfigurement be permanent, he would have carefully preserved the eyelid so that it could be reattached, rather than spitting it at Flores and would not have tried to prevent her from leaving to seek medical attention.  Furthermore, it is noteworthy that appellant bit Flores on an extremely vulnerable part of her body—the tissue covering her eye—rather than on her arm or chest.  The limited scope of appellant's attack on Flores's face shows this was not an indiscriminate attack but instead was an attack guided by the specific intent of inflicting serious permanent injury to her face.  It is particularly significant that appellant stopped his attack once he had maimed Flores's face.  In short, he had

10

accomplished his objective. Furthermore, after the incident appellant stated, "Next time I'll shoot her goddamn eyeball out of her face." This statement supports an inference that the injury to Flores's face was deliberate rather than accidental. Taken together the circumstances indicate that appellant intentionally and deliberately bit Flores's eyelid to cause permanent injury to her face. (See *People v. Park* (2003) 112 Cal.App.4th 61, 69 [concentrated attack on vulnerable head and face sufficient evidence of specific intent to maim].) The fact that the maiming injury was inflicted by a single act without the use of any weapon is of no moment. Appellant's choice of an extremely vulnerable part of Flores's face and the fact that he bit her and tore away part of her skin in a single action simply shows that he was able to achieve his goal in an expeditious fashion.

In sum, the evidence was sufficient for the jury to find that appellant had the specific intent to maim Flores.

*Alleged Instructional Error*

Appellant contends that the trial court erroneously refused to give his proposed instruction on the specific intent necessary for aggravated mayhem.

Defense counsel requested two instructions. Specifically, he asked the court that the jury be instructed that "evidence that shows no more than [an] indiscriminate attack is insufficient to prove the required specific intent"[7] and "[s]pecific intent to maim may not be inferred solely from evidence that the injury inflicted actually constitutes mayhem. There must be earlier facts and the [*sic*] circumstances were supportive due to intent to maim rather than to attack indiscriminately." Defense counsel cited to *People v. Park*, *supra*, 112 Cal.App.4th at page 64 in support of this part of his request. We note that the actual wording in *People v. Park* is as follows: "[S]pecific intent to maim may not be

---

7    Defense counsel took this language from *People v. Horvath* (2012) 204 Cal.App.4th 100, 105. The case was decertified on 06/13/2012. However, the language appears in *People v. Assad* (2010) 189 Cal.App.4th 187, 195 and *People v. Park, supra,* 112 Cal.App.4th at page 64, and *People v. Ferrell* (1990) 218 Cal.App.3d 828, 835.

11

inferred solely from evidence that the injury inflicted actually constitutes mayhem; instead, there must be other facts and circumstances which support an inference of intent to maim rather than to attack indiscriminately." (*Id.* at p. 64.) We assume that this is what counsel meant by his request.

The court refused to give the instruction on the basis that the standard instruction on aggravated mayhem, CALCRIM No. 800, "addresses the issue of intent sufficiently."

Appellant contends that the court erred because the two instructions were not covered by any other instruction and were not argumentative. Further, he was entitled to instructions that pinpointed the crux of his defense. Appellant asserts that the erroneous refusal to give the pinpoint instructions was prejudicial since the crucial issue of intent was based on weak evidence. Accordingly, he argues that his aggravated mayhem conviction must be reversed.

In essence, appellant's requested instructions would have informed the jury that an indiscriminate attack that caused a maiming injury could not by itself prove the specific intent to maim, that there had to be other circumstances that supported an inference of intent to maim. In other words, the jury would have understood that to find appellant guilty of aggravated mayhem they would have to find more than that the maiming injury occurred.

Initially, we note that the court instructed the jury pursuant to CALCRIM No. 800 as follows: "The Defendant is charged in Count 1 with aggravated mayhem in violation of Penal Code section 205. [¶] To prove that the Defendant is guilty of this crime, the People must prove that: [¶] 1. The Defendant unlawfully and maliciously disfigured someone permanently or deprived someone else of a part of her body; [¶] 2. When the Defendant acted, he intended to disfigure the other person or deprive the other person of a part of her body; [¶] AND [¶] 3. Under the circumstances, the Defendant's act showed extreme indifference to the physical or psychological well-being of the other person. [¶] Someone acts maliciously when he intentionally does a wrongful act or when he acts with

12

the unlawful intent to annoy or injure someone else. [¶] A disfiguring injury may be permanent even if it can be repaired by medical procedures. [¶] The People do not have to prove that the Defendant intended to kill."

In addition, the court instructed the jury pursuant to CALCRIM No. 225 that before they could rely on "circumstantial evidence to conclude that the Defendant had the required intent" the jury had to "be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the Defendant had the required intent." The jury was told that they had to find appellant guilty beyond a reasonable doubt, and that the charge of aggravated mayhem required that appellant intentionally caused permanent disability and disfigurement. Taken together these instructions fully set forth the requisite intent for the aggravated mayhem charge. "A trial court is not required to give pinpoint instructions that merely duplicate other instructions." (*People v. Panah* (2005) 35 Cal.4th 395, 486.)

Appellant argues, however, that the standard instructions did not advise the jury what factors it could consider in deciding whether he intended to maim, the second essential element of aggravated mayhem. Nor did the instructions advise the jury that the intent to maim cannot be inferred solely from the infliction of an injury that qualifies as mayhem, and finally the instructions did not advise the jury there must be facts and circumstances that support an inference of the intent to maim rather than to attack indiscriminately.

The language that appellant requested actually comes from one of the first cases to consider section 205. *People v. Ferrell*, *supra*, 218 Cal.App.3d 828 (*Ferrell*) determined, from the language of the section 205, that "the specific intent to cause the maiming injury is an element of aggravated mayhem." (*Id*. at p. 833.) The *Ferrell* court was considering a challenge to the sufficiency of the evidence of specific intent when the court observed: " 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.

13

[Citations.]' [Citation.] A jury may infer a defendant's specific intent from the circumstances attending the act, the manner in which it is done, and the means used, among other factors." (*Id.* at p. 834.)

*Ferrell* went on to state: "Despite the differences in the statutory language . . . the standards articulated in cases involving felony-murder mayhem are instructive here. Evidence which shows no more than an 'indiscriminate attack' is insufficient to prove the specific intent to commit mayhem under section 203. [Citations.] Furthermore, specific intent to maim may not be inferred solely from evidence that the injury inflicted actually constitutes mayhem; instead, there must be other facts and circumstances which support an inference of intent to maim rather than to attack indiscriminately." (*Ferrell, supra,* 218 Cal.App.3d at p. 835.)

It is well established that "a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation] or if it is not supported by substantial evidence [citation]." (*People v. Moon* (2005) 37 Cal.4th 1, 30 (*Moon*).) An instruction that directs the jury to consider certain evidence is properly refused as argumentative. A proper instruction does not pinpoint specific evidence as such, but the theory of the defendant's case. (*People v. Ledesma* (2006) 39 Cal.4th 641, 720.)

Insofar as part of the requested instructions referred to an indiscriminate attack, there was no evidence, substantial or otherwise, of an indiscriminate attack on Flores and defense counsel did not argue to the jury that the attack on Flores was indiscriminate, rather he argued that appellant was acting in self-defense. That part of the request was properly refused as it reflected neither the defense theory nor the evidence. (Cf. *People v. Hartsch* (2010) 49 Cal.4th 472, 501–502.)

With regard to the rest of the requested instructions we question whether it is an accurate statement of the law. (Cf. *Moon, supra,* 37 Cal.4th at p. 31 [case law regarding sufficiency of evidence on appeal of premeditation and deliberation would be an

improper jury instruction].)  "Language in an appellate opinion which may be a good statement of law or the reasoning of the appellate court does not necessarily make a good jury instruction."  (*People v. Adams* (1987) 196 Cal.App.3d 201, 204–205; cf. *People v. Colantuono* (1994) 7 Cal.4th 206, 221, fn. 13.)  Alone, the type of injury inflicted may well establish the intent to disfigure sufficient to sustain a conviction.  (Cf. *Ferrell*, *supra*, 218 Cal.App.3d at pp. 835-836.)[8]

In addition, we believe it would be argumentative to instruct the jury essentially to disregard the resulting injury as a circumstance probative of the attacker's intent.  "It is improper for an instruction to indicate an opinion favorable to the defendant regarding the effect of the evidence."  (*People v. Hartsch, supra,* 49 Cal.4th at p. 504.)  The effect of certain facts on identified theories is best left to argument by counsel, cross-examination of the witnesses, and expert testimony where appropriate.  (*People v. Roberts* (1992) 2 Cal.4th 271, 314.)

As noted, defense counsel did argue to the jury that evidence of a person being maimed was not enough to establish the specific intent involved.  The part of the instruction—specific intent to maim may not be inferred solely from evidence that the injury inflicted actually constitutes mayhem, there must be other facts and circumstances

---

[8]     *Ferrell* had no trouble finding sufficient evidence of specific intent when one woman went to another woman's apartment with a handgun, asked for her by name, said she was sent by a friend from jail, threatened to kill her if she moved, and shot the woman once in the neck from two feet away after shooting a man in the leg.  (*Ferrell*, *supra*, 218 Cal.App.3d at pp. 831–832.)  The court noted that the defendant fired only one shot into the victim's neck at close range.  The court commented that the defendant "was apparently satisfied with the result of her single shot.  It takes no special expertise to know that a shot in the neck from close range, if not fatal, is highly likely to disable permanently.  Appellant's shooting of Perreira was not an indiscriminate, random attack on her body; instead, the shooting was directed and controlled.  From all this evidence, the jury could reasonably have inferred that appellant intended both to kill Perreira, and, if she did not die, to disable her permanently."  (*Id.* at pp. 835–836.)

which support an inference of intent to maim rather than to attack indiscriminately—was properly refused as argumentative. (Cf. *Moon, supra,* 37 Cal.4th at p. 32.)

Finally, even if we were to assume for the sake of argument that the instructions were legally correct and the court erred, the failure to give a legally correct pinpoint instruction is a state law error subject to review under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Pearson* (2012) 53 Cal.4th 306, 325 & fn. 9; *People v. Hughes* (2002) 27 Cal.4th 287, 362–363; *People v. Wilkins* (2013) 56 Cal.4th 333, 348–349.)

At the outset, we reject any suggestion that the evidence of appellant's intent was weak. The evidence as outlined *ante* was strong evidence of appellant's intent to maim. Instead of immediately dropping the severed eyelid, and preserving it for reattachment, appellant pursued Flores into the bathroom and spat it at her. When Flores tried to leave, appellant tried to prevent her by throwing her to the ground and kicking her. In the past appellant had targeted Flores's eye for damage and he threatened to do the same in the future.

Moreover, with respect to the aggravated mayhem charge, defense counsel argued that it was a specific intent crime, which meant that appellant "must not only intend to do harm," but intended to "do [the] harm which was caused by the injury"; and as to the laceration to Flores's eyelid, if he intended to harm her generically, then that would not fit the legal definition of specific intent to disfigure. Counsel went on to say that the People had to prove that appellant intended to disfigure Flores i.e. remove a body part — her eyelid. Later, defense counsel argued, "[t]he injury itself is not and cannot be the sole reason that you imply specific intent." Based on the instructions given, appellant could and did defend on the theory that he lacked the requisite intent, and defense counsel's argument fully explored this theme. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144-1145 [if failure to give pinpoint instruction was error, it was harmless because nothing in the instructions given precluded the jury from adopting the defense theory, which was fully covered in counsel's argument].)

16

In sum, given the strong circumstantial evidence of an intentional targeting of a vulnerable part of Flores's face, there is no reasonable likelihood that appellant would have received a more favorable outcome had the court given the requested pinpoint instructions.

*Right to Present a Defense*

Appellant argues that the court's refusal to give the pinpoint instructions requested by defense counsel violated his fundamental due process right to present a complete defense to the charges.  Respectfully, we disagree.

"As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." (*Mathews v. United States* (1988) 485 U.S. 58, 63.)  Further, under appropriate circumstances, "a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case by, among other things, relating the reasonable doubt standard of proof to particular elements of the crime charged. [Citations.]  But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation]." (*People v. Bolden* (2002) 29 Cal.4th 515, 558.)

Certainly, the California Supreme Court has acknowledged that a trial court's failure to give a requested instruction concerning the defense theory of the case may under certain circumstances violate a defendant's due process right to present a complete defense.  (*People v. Rogers* (2006) 39 Cal.4th 826, 872.)  However, the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction standing alone. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.)

Appellant relies on cases in which federal courts have held that a trial court's failure to give a requested instruction (whether on a lesser included offense, or on some other subject) embodying the defense theory of the case and around which the defendant

17

had built his or her defense, violated the defendant's due process right to present a complete defense. (*Clark v. Brown* (9th Cir.2006) 442 F.3d 708, 713–718 [instruction on felony-murder special circumstance]; *Conde v. Henry* (9th Cir.2000) 198 F.3d 734, 739–740 [instruction on simple kidnapping as lesser included offense of kidnapping for robbery]; *Bradley v. Duncan* (9th Cir.2002) 315 F.3d 1091, 1098–1099 [instruction on defense of entrapment].)

The crux of appellant's defense was that he did not have the intent to maim Flores when he bit off her eyelid. Here, as noted *ante*, the instructions as given plainly conveyed to the jury that they could not convict appellant unless they found beyond a reasonable doubt that he had the specific intent to maim. The jury was told that to find appellant guilty of aggravated mayhem they had to find as one of the elements that when appellant acted "he intended to disfigure the other person or deprive the other person of a part of her body." To the extent that the constitutional right to present a defense includes the right to instructions on a criminal defendant's theory of the case, a defendant is not entitled to an instruction in his or her own words if other instructions given adequately cover that defense theory. (Cf. *U.S. v. Romm* (9th Cir.2006) 455 F.3d 990, 1002.) Simply put, we have already concluded that the trial court's instructions accurately and adequately described the quality of circumstantial evidence needed to prove beyond a reasonable doubt the specific intent to maim.[9] The instructions given did not preclude appellant from arguing to the jury that there was insufficient evidence of a specific intent to disfigure and that more had to be shown than the result being a maiming injury. As noted, in fact, appellant made that argument. Appellant's right to present that defense was in no way compromised by the instructions given.

---

[9]     As we have addressed this issue, it is not necessary to address appellant's claim that if this claim is deemed forfeited, he was deprived of the effective assistance of counsel.

18

In sum, we conclude that the refusal to give the pinpoint instructions that appellant requested did not violate appellant's constitutional right to present a defense.

*Disposition*

The judgment is affirmed.

_____

ELIA, J.

WE CONCUR:

_____

RUSHING, P. J.

_____

PREMO, J.